394 F.2d 704
 CENTRAL MANUFACTURING CO., a Corporation, and Lottie Yancy,
Temporary Administratrix of the Estate of Samuel
Inmon, Deceased, Appellants,
v.
ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellee.
 No. 18954.
 United States Court of Appeals Eighth Circuit.
 May 9, 1968.
 
 Boyd Tackett, of Shaver, Tackett & Jones, Texarkana, Ark., for appellants; Thomas Hathaway, of Johnson, Hathaway & Jackson, Tyler, Tex., and Norman C. Russell, of Atchley, Russell, Hutchinson & Waldrop, Texarkana, Tex., on the brief.
 C. Wayne Harris, Fort Smith, Ark., for appellee; E. D. Grinnell, Jr., St. Louis, Mo., and C. R. Warner, Jr., and Heartsill Ragon, Fort Smith, Ark., on the brief.
 Before MATTHES, GIBSON and HEANEY, Circuit Judges.
 FLOYD R. GIBSON, Circuit Judge.
 
 
 1
 On April 15, 1966, Samuel Inmon, while driving a heavily loaded tractor trailer truck west on Arkansas State Highway 355 near McNab, Arkansas, collided with the 33rd freight car of a train operated by the St. Louis-San Francisco Railway Company (Frisco). The impact was severe, causing a derailment of several of the freight cars, the total destruction of the tractor trailer and the death of Mr. Inmon. Frisco filed a complaint in the federal district court for damage to the freight cars; and Lottie Yancy, Inmon's Temporary Administratrix, as an intervening defendant, and Central Manufacturing Company, a corporation, Inmon's employer and a defendant, filed cross-complaints against the Frisco for damages resulting from Inmon's death and to the tractor trailer respectively.
 
 
 2
 The jury on special interrogatories found that Inmon's negligence was the proximate cause of the collision and that the Frisco was not guilty of any negligence. As a result of the jury verdict judgment was entered in favor of the Frisco in the amount of $10,000 and against defendants on their counterclaims. Yancy, as Temporary Administratrix of Samuel Inmon, Deceased, and Central Manufacturing Company, a corporation, duly appealed. This is a diversity case in a requisite jurisdictional amount and the substantive law of Arkansas applies.
 
 
 3
 Defendants on appeal claim the Court erred, (1) in excluding a letter written by one of the Frisco's attorneys, who was also an Arkansas State Representative, regarding the crossing in question and making particular reference to the hazardous nature of the crossing, and (2) in refusing to modify the Arkansas Model Instruction relating to a hazardous crossing and in failing to give the defendants' proffered instruction on that issue.
 
 
 4
 The railroad crossing of Arkansas State Highway 355 near McNab, Arkansas, ordinarily carried only the loal run of a train operated on a daily round trip basis between Hugo, Oklahoma, and Hope, Arkansas. This train of about 42 freight cars was running 10 to 12 miles per hour over the crossing when the tractor trailer approached from the south and collided with about the 33rd freight car back of the engine. There were no skid marks on the highway approaching the crossing from the south. The crossing is located in an area of lakes and rivers that generate atmospheric conditions of fog. The collision occurred in the early morning hours, about 4:30 a.m., when the whole area was shrouded in a dense fog, vision was limited and highway traffic was necessarily restricted and dangerous.
 
 
 5
 The usual audible signals for a crossing were given by the Frisco crew. There were no eye witnesses to the collision and the engineer and engine crew were not aware of the accident until the brakes were automatically applied when the couplings on some of the freight cars were knocked loose. Although the railroad crossing is depressed from the grade of the highway when approaching from the south, there is nothing to obstruct the view of the crossing area from a state highway speed limit sign 1225 feet south of the crossing and a train on the crossing would be visible from that point, absent adverse atmospheric conditions. A regular cross-arm railroad crossing sign was located on the north side of the crossing and would not be visible from the south when blocked out by the 10-foot high tank cars. Inmon was not unfamiliar with the crossing. The evidence on this issue is conflicting but it is conceded that he made at least six round trips over this crossing. In addition to two speed limit signs on the approach from the south located at 1225 feet and 950 feet, there is a third sign warning of the railroad crossing 570 feet south of the crossing. There were no other warning signals at the crossing, no flagman, and no illuminative or reflective signals on the freight cars. Traffic was not heavy and the crossing had not been designated by the County or State authorities as an abnormally hazardous crossing as authorized by state law.
 
 
 6
 Defendants contend the crossing was in fact an extra hazardous one under Arkansas law and thus subject to the protection of automatic signalling devices or a signalman. In an interrogatory Frisco had answered it had never had a complaint on the crossing. To impeach this answer and to also show that Frisco had knowledge of the hazardous nature of the crossing, the defendants offered in evidence a part of a letter written by Talbot Feild, Jr., who was a counselor of record for Frisco in this case and was also an Arkansas State Representative. This letted dated May 17, 1966, was written in response to a letter addressed to Feild in his capacity as a State Representative by three ladies of McNab, Arkansas, under date of April 15, 1966, concerning the hazardous railroad crossing at McNab Arkansas.[1] The letter of Feild was written on State Representative stationery in his capacity as a legislator and not as an attorney or agent for the Frisco. The J. H. Norris mentioned as an engineer for the Frisco was not produced at trial and apparently could not be located by any of the parties nor was there any record of his employment with the Frisco, which gives rise to the inference that the person calling used a fictitious name.
 
 
 7
 Generally any relevant writing by the party charged would be admissible and considered as evidence on the probative facts set forth in such writing. But,
 
 
 8
 'Private writings which emanate from a source other than the party against whom they are sought to be introduced should be shown to have been authorized by, or otherwise to be binding upon, him. Generally speaking, the rights of an individual cannot be affected by written statements of persons who act in an unofficial capacity in respect of matters to which he is a stranger; as to him such writings are inadmissible. They are hearsay and res inter alios. In such cases the principle is applicable that unsworn written statements of living persons who may be produced in court as witnesses are not admissible.' 29 Am.Jur.2d Evidence, 836, p. 929.
 
 
 9
 In this case Feild was not authorized by the Frisco to reply to the ladies' letter of April 15, 1966, nor is there any showing that the Frisco had any knowledge of it, nor is there even any showing on the record that Feild had any personal knowledge regarding the crossing. Feild clearly did not undertake or purport to act or speak for the Frisco on the matter. His whole letter is directed towards his duties and functions as a state legislator. Even assuming he had knowledge both of the crossing and the hazardous nature thereof, this would not be imputable to his principal, the Frisco, under the circumstances of this case. It could, of course, be shown, if it were a fact, that the Frisco had received information from any source about the alleged hazardous nature of the crossing. Contrary to the general rule, it is clear that the knowledge of an agent will not be imputed to his principal where the agent acts without authority, or acts for himself of others, or has a personal interest in the transaction. Little Red River Levee Dist. No. 2 v. Garrett, 154 Ark. 76, 242 S.W. 555 (1922). See, 19 Am.Jur.2d 1288 at p. 694; 19 C.J.S. Corporations 1081 at p. 618.
 
 
 10
 The trial court properly excluded the letter and it was of little probative value. Whether the crossing was in fact abnormally dangerous were a factual matter to be determined by the jury under the properly admitted evidence relating to the locale of the crossing, the frequency of use of the highway, the comparable traffic on the highway, the location of buildings or other obstructions to an adequate view of the crossing by approaching traffic and other related factors that would directly bear upon this factual issue. A complaint about the crossing would not of itself be probative evidence of the hazardous nature thereof; though, of course, an admission of its hazardous nature would be relevant and could be held against the party charged. Here, there was no admission, nor knowledge of complaints prior to the collision of April 15, 1966 shown by the evidence or the rejected letter of Feild.
 
 
 11
 This brings us to defendants' second contention that the Court erred in charging the jury on the issue of whether the crossing was hazardous under Arkansas law.
 
 
 12
 The blocking of highway traffic by trains has been a recurring traffic hazard on the Arkansas streets and highways as is attested by the numerous reported appellate decisions in this field. An earlier compilation and resume of the law applicable to these crossing collisions is outlined in Lloyd v. St. Louis South-western Ry. Co., 207 Ark. 154, 179 S.W.2d 651 at pp. 652-653 (1944):
 
 
 13
 'The precautions which railroads should exercise to warn travelers of the blocking of highways by trains standing at crossings has frequently had the attention of this court. Missouri Pac. R.R. Co. v. Price, 182 Ark. 801, 33 S.W.2d 366.
 
 
 14
 'Although as was stated by Mr. Justice Baker in Missouri Pac, R. Co. v. Powell, 196 Ark. 834, 120 S.W.2d 349, 353, the effect of these cases is that ordinarily a 'train occupying the crossing is notice to parties approaching in an automobile', this court has recognized the fact that extraordinary hazardous conditions may exist, or occur, at certain crossings, which would impose upon the railroad the duty to give special warning that a train blocks such crossing. Thus in the case of Fleming v. Missouri & Ark. Ry. Co., supra (198 Ark. 290, 128 S.W.2d 988), it was said: 'It is the settled rule that whether failure of a railroad company to station a flagman at a crossing constitutes an omission of such care as an ordinarily prudent person would use under the same or similar circumstances, is a question of fact where there are obstructions which materially hinder the view of approaching trains, provided the crossing is used frequently by the public, and numerous trains are run. Inasmuch as permanent surroundings may create a hazardous condition, the rule of care goes further and requires precautions where special dangers arise at a particular time."
 
 
 15
 Another illuminating and exhaustive analysis of the Arkansas law is set forth by Judge Vogel in Chicago, Rock Island & Pacific Railroad Company v. Kinard, 299 F.2d 829 (8 Cir. 1962). It is unnecessary to make another detailed analysis of the Arkansas law in this case. The thrust of all the relevant Arkansas cases is that the jury is entitled to pass upon the factual issue of whether an extraordinary hazardous condition exists at a particular crossing, and if so, whether the warning responses and devices maintained or initiated by the railroad are such as an ordinary prudent person would supply and perform under the same or similar circumstances to enable the traveling public to use the crossing with reasonable safety. And also where, as in many of these cases, the contributory negligence of the driver of the vehicle was as a matter of law at least equal to, if not greater than, the negligence of the railroad, the motorist cannot prevail.
 
 
 16
 On the hazardous crossing issue the Court charged the jury in accordance with Arkansas Model Instruction No. 1805 (AMI).[2] The defendants contend that the instruction fails to properly set out the Arkansas law on an abnormally dangerous railroad crossing as that law is set forth in Fleming v. Missouri & A. Ry. Co., 198 Ark. 290, 128 S.W.2d 986, 988 (1938):
 
 
 17
 '* * * That the obligation exists, at an abnormally dangerous crossing, to provide watchmen, gongs, lights, or similar warning devices not only for the purpose of giving notice of approaching trains, but such care is to be equally observed where the circumstances make their use by the railroad reasonably necessary to give warning of cars already on a crossing, whether standing or passing, as where a crossing is more than ordinarily dangerous because of obstructions to the view interfering with the visibility of the responsible train operatives, or those approaching the track.'
 
 
 18
 The defendants requested the Court to insert in lieu of the last paragraph of the AMI instruction (see fn. 2) a paragraph based on the Fleming case, which sets out with some specificity the duty of the railroad in protecting the public from an abnormally dangerous crossing,[3] rather than the more abstract paragraph contained in the AMI instruction.
 
 
 19
 In connection with the Court's refusal to modify, as requested the Model Instruction, we note that the Supreme Court of Arkansas approved these instructions and directed that the trial judge should use these instructions where applicable, unless the trial judge should find that the instruction does not accurately state the law, in which event the trial judge is required to state his reason for refusing to give the AMI instruction. Although the federal courts are not bound by this directive, the same should be given careful consideration.
 
 
 20
 In viewing the instruction as a whole, we believe an abstract instruction generally will fit and cover the more varied factual situations that are presented in a case than would a specific or enumerative type of instruction that could suffer from the vice of being incomplete, overly detailed or misleading. The modified instruction sought to take from the jury its right to determine what ordinary care would require under the circumstances of this case and set up as a matter of law the specific acts the defendants contend are required by the law. This appears to be a too narrow and restrictive approach of what would constitute reasonable precautionary warnings under the circumstances then and there existing. It appears to us that this is a factual situation for jury determination; and what specific actions a reasonable prudent person exercising ordinary care, would take under the same or similar circumstances, is a matter for argument before the jury rather than by declaration of law. At least it has certainly not been shown that the trial court should have modified the AMI instruction. Naturally any fog-shrouded railroad crossing is hazardous but the thrust of the law appears directed towards the abnormally hazardous type of crossing made hazardous by physical obstructions, frequency of trains and volume of highway traffic. In this particular instance the train usage was minimal, there was no showing of physical obstructions hindering a view of the crossing from a considerable distance in the approach from the south and there was no showing as to the volume of highway traffic. This almost paraphrases the factual situation in Fleming, where the Arkansas Supreme Court at p. 989 of 128 S.W.2d noted:
 
 
 21
 'The freight cars were on the crossing, the highway was straight for a distance of a hundred yards, Fleming's headlights were ample, there were no abutting buildings or other obstructions, the train was not suddenly projected across the highway; and, although the weather was misty and perhaps there had been a slight rain, it is not shown that visibility was extraordinarily poor. Even if such had been the case, that fact in itself enjoined upon Fleming additional care for his own safety.'
 
 
 22
 These same remarks were approved by us in Chicago, Rock Island & Pacific Railroad Company v. Kinard, 299 F.2d 829, 836 (8 Cir. 1962), where a car was driven into the side of a moving freight train at night; we concluded that under Arkansas law the plaintiff's contributory negligence was established as a matter of law and found, as a matter of law, such negligence was at least equal to, if not greater than, the negligence on the part of the railroad.
 
 
 23
 In the case at bar the jury found Yancy's testate, Inmon, guilty of negligence which proximately caused the collision and the Frisco free of causative negligence. This finding is supported by the evidence. There were no skid marks on the highway, the impact was particularly severe, and driving conditions extremely dangerous. Inmon, who was conscious for a period after the accident, stated in a response to a question from one of the brakemen on what had happened: 'I don't know. I don't know whether I went to sleep or not. I did not see the train.' Inmon was a victim of the dense fog, and should have proceeded, if at all, in an extremely cautious manner. As noted in O'Keefe v. Wabash R. Co., 185 F.2d 241, 245 (7 Cir. 1950), where an automobile crashed into a switch engine and caboose of a freight train standing on a crossing in a heavy fog:
 
 
 24
 'We are cited to no authority and our research has disclosed no holding that in order to avoid the charge of negligence the fact of a fog alone is enough to impose a duty on the railroad to give more notice and warning than the record shows was given here.
 
 
 25
 'Since the evidence fails to show any negligence of defendant which proximately contributed to the accident, the judgment must be reversed.'
 
 
 26
 This regrettable accident again points out the need for greater than ordinary caution and care on the public highways, particularly at railroad crossings. But that is a policy matter, not for our decision. The evidence here is certainly sufficient for the jury to find that Inmon was negligent and that the Frisco was not.
 
 
 27
 Under these circumstances we think the issues were properly submitted and the Court's ruling on evidence was correct. A third point raised on appeal was abandoned by defendants and is not, therefore, discussed.
 
 
 28
 The judgment is affirmed.
 
 
 
 [1]
 The portion of the letter offered is as follows:
 'May 17, 1966
 'Mrs. J. K. Porter Mrs. W. E. Turley Mrs. Vera McJunkins McNab, Arkansas 'Dear Ladies:
 'This will acknowledge your letter dated April 15, 1966, concerning the hazardous railroad crossing at McNab, Arkansas.
 'On March 18, 1966, I received a call from Mr. J. H. Norris an Engineer on the Frisco, advising me of the dangerous situation existing at the McNab crossing. * * *
 Sincerely yours, Talbot Feild, Jr.'
 
 
 [2]
 The Instruction reads as follows:
 'The Administratrix of the Estate of Samuel E. Inmon, Deceased, and Central Manufacturing Company contend that the railroad grade crossing in this case was abnormally dangerous and they have the burden of proving this proposition.
 'If a railroad crossing is frequently used by the traveling public, if trains pass over it frequently, and if the crossing is so dangerous because of surrounding circumstances that a reasonably careful person could not use it with reasonable safety in the absence of special warnings, then it would be an abnormally dangerous crossing. Whether the railroad grade crossing in this case was abnormally dangerous is for you to decide.
 'If you find that the crossing was abnormally dangerous as I have defined that term, then it was the duty of the railroad to use ordinary care to give a warning reasonably sufficient to permit the traveling public to use the crossing with reasonable safety.'
 
 
 [3]
 The paragraph requested reads as follows:
 'If you find that the crossing was abnormally dangerous, as I have defined that term, then it was the duty of the railroad to provide watchmen, gongs, lights or similar warning devices not only for the purpose of giving notice of approaching trains, but such care is to be equally observed where the circumstances make their use by the railroad reasonably necessary to give warnings of cars already on a crossing, whether standing or passing, as where a crossing is more than ordinarily dangerous because of obstructions to the view interfering with the visibility of the responsible train operatives, or those approaching the track. You are further instructed that a railroad crossing may become abnormally dangerous at a particular time where special dangers arise.'